Edward P. ARCHER, Leonard E. Buckley, Gary Chaconas, Peter Cocci, Joseph Creamer, James L. Goodbody, Thomas R. Hipschen, Clarence Holbert, Hugh R. Kasley, Kenneth Kipperman, John Masure, Paul Purgason, V. Jack Ruther, Albert Saavedra, Stanley Scantlin, Ronald C. Sharpe, Gary Slaght, John Wallace, Frank Waslick and Kenneth Wiram, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. 166–85C.

United States Claims Court.

Oct. 5, 1989.

John C. Morrison, Alexandria, Va., for plaintiffs.

Stephen J. McHale, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart Schiffer, for defendant.

OPINION

RADER, Judge.

Plaintiffs, twenty individual employees of the Bureau of Engraving and Printing (Bureau), Department of the Treasury

(Treasury), originally brought this action in the United States District Court for the District of Columbia through their union, the Bank Note Engravers Guild. Plaintiffs claimed that the Bureau unreasonably denied pay increases from 1979 to 1984. On March 26, 1985, the district court transferred this action to the United States Claims Court. Plaintiffs allege that the Director of the Bureau did not fully implement pay raises and exercise pay-fixing responsibilities mandated by 5 U.S.C. § 5349(a) (1982) and Treasury regulations. Defendant argues that the Government's actions were proper.

This case is before the Claims Court on plaintiffs' motion for partial summary judgment and defendant's cross-motion for summary judgment. This court grants plaintiffs' motion.

## FACTS

Plaintiffs are picture, letter, and sculptural engravers for the Bureau. The Bureau has designated them as craft employees. Title 5 U.S.C. § 5349 entitles craft employees, including plaintiffs, to a different pay system than the wage-survey method generally applicable to prevailing rate employees. Title 5 links plaintiffs' wages to wages paid similar employees in the private sector. Thus, plaintiffs receive salary increases when the salary for similar positions at the American Bank Note Company (ABN) rise.

The Secretary of Treasury (Secretary) has the obligation to administer these pay adjustments. Title 5 states:

> The pay of employees [at] the Bureau of Engraving and Printing ... shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and in accordance with such provisions of this subchapter, including the provisions of section 5344, relating to retroactive pay, and subchapter VI of this chapter, relating to grade and pay retention, as the pay-fixing authority of each such agency may determine.

5 U.S.C. § 5349(a). Thus, the Secretary must keep the pay of craft employees at the Bureau "as nearly" linked to ABN pay "as is consistent with the public interest." The Secretary's obligation to adjust Bureau employees' pay in tandem with ABN employees is tempered by his discretion to determine whether the public interest requires abandonment of the linkage.

The Secretary has delegated his pay-fixing discretion, in part, to the Director of the Bureau. 5 C.F.R. § 532.105 (1988). According to the Treasury Personnel Manual, the Secretary and the Director must administer rates of pay "within policies and practices of the Federal Wage System...." Treasury Personnel Management Manual (TPMM) at I–2.

The applicable TPMM provisions state:

> Employees in the Bureau of Engraving and Printing performing and supervising work as Designer, Engraver, Plate Finisher, Plate Printer, Plate Hardener, Plate Maker, Sculptural Engraver, and Siderographer *will be paid rates based on job-to-job comparisons* with comparable jobs in the American Bank Note Company, New York, N.Y. The schedule provides single rates adjusted whenever rates for each matched job are adjusted in the American Bank Note Company.

TPMM at IV–2 (emphasis added).

The parties agree that wage increases for Bureau personnel such as plaintiffs usually fall into one of two categories. The first category is general cost-of-living adjustments. The Bureau may grant these increases to plaintiffs without obtaining prior approval from Treasury. These increases are, however, subject to limitations based upon public interest determinations or policies established by the Treasury.

The second category of wage increases consists of those increases provided as differentials or premiums. A differential increase is an adjustment based upon performance of new and additional duties. The Secretary has not delegated his authority to grant these differential increases to the Bureau. The Bureau may recommend, but not approve, such increases. The Director of Personnel at the Treasury must approve these increases.

If ABN grants its employees a differential increase, the Secretary must determine that the Bureau's employees are doing the same extra work for which ABN employees received extra pay. If the Bureau employees are also doing extra work, they are, in the absence of countervailing public interest, entitled to extra pay as well.

In 1979, the Secretary announced anti-inflationary pay caps for all federal employees. In memoranda to department heads, the Treasury limited pay increases to 5.5% for fiscal year 1979 and 7.02% in fiscal year 1980. During fiscal year 1979, wage rates for ABN employees increased by 6%. Initially, Bureau employees also received a matching 6% increase. On June 8, 1980, the Bureau reduced this increase to 5.5% to comply with the pay cap.

During fiscal year 1980, ABN employees received a total of 9.5% in wage increases. The 9.5% increase consisted of a 7% wage increase, a 1% cost of living allowance, and another 1.5% increase. Plaintiffs' wages, however, were still subject to the pay caps. Accordingly, plaintiffs (and other Treasury employees) received only a 7% wage increase. Two successive years of pay caps created a gap between plaintiffs' wages and the wages of their counterparts at ABN.

A second discrepancy increased that gap. In 1983, the Bureau implemented weekly raises to keep pace with ABN raises without taking into account the difference in duration of the workweek for ABN and Bureau workers. Twice that year, ABN gave its employees a $17.20 per week raise. This raise amounted to an additional $.50 per hour for ABN employees based on a 34.5 hour workweek. Because its employees performed the same extra duties, the Bureau granted them a comparable weekly raise. The Bureau, however, operates on a 40–hour workweek. Therefore, plaintiffs received an increase of only $.43 per hour. Although Bureau employees received the same weekly increase as ABN employees, the difference in working hours resulted in a $.07 per hour wage differential.

In 1984, plaintiffs observed a gap between their wages and ABN wages.

Therefore, in June 1984, plaintiffs informed the Bureau of the gap between hourly wages for ABN and Bureau engravers. The Bureau reviewed only the 1978 and 1980 salary actions. On August 16, 1984, the Director of the Bureau, Mr. Ellenberger, reported to the local union by letter:

I reviewed the Bureau's records of the pay increase granted the Engravers and find no basis for the discrepancy. The question has been referred to the Department of Treasury who is the pay fixing authority for review.

At that time, the Bureau could not explain the reason for the discrepancy. Simultaneously, the Bureau by letter reported the wage discrepancy to the Treasury:

The divergence began in 1979, prior to the imposition of the current round of pay caps, and the difference continues to grow each year. The amount of the difference exceeds that which can be explained by the pay caps. The Union does not understand the source of the difference and our records give no clue, since only a short letter was received each year from ABN giving the percentage increase to be granted. The Union is asking for retroactive adjustments to their pay and the Bureau supports those adjustments if they are warranted.

The Bureau thus recommended retroactive increases to close the gap, if warranted. The Treasury did not respond to this request.

Four years later, in the context of pleadings before the Claims Court, defendant submitted Mr. Ellenberger's affidavit of June 29, 1988. By this time, Mr. Ellenberger had investigated and reviewed all the available information. He concluded that the 1980 7% pay cap precluded award of ABN's 9.5% overall wage increase to plaintiffs. He also noted that if plaintiffs had requested a catch-up increase in 1981, the Bureau could have retroactively provided these increases.

As part of this comprehensive review in 1988, Mr. Ellenberger discovered that neither the Secretary nor the Director of Personnel had approved the two $17.20 per week raises granted in 1983. The Bureau's

Office of Chief Counsel discovered this oversight in April 1987. Thus, in sum, Mr. Ellenberger denied the Bureau's recommendation to close the gap "in view of unexplained [1983] wage increases." [1] This conclusion in 1988 controverted Mr. Ellenberger's earlier letter to plaintiffs' counsel. The January 12, 1984 [2] letter provided that plaintiffs' two $17.20 per week raises were within the 4% pay cap applicable in 1983.

Plaintiffs seek back pay for wage increases denied in fiscal years 1979 and 1980 because the statutes and regulations mandate comparable pay for comparable jobs at ABN. Plaintiffs further contend that defendant committed legal error by failing to fully implement the contested 1983 pay increases authorized by Treasury Regulations and whether failing to correct those errors constituted an abuse of discretion.

Defendant contends that Treasury reasonably denied increases to plaintiffs in fiscal years 1979 and 1980 in compliance with administrative pay caps. Defendant also contests the 1983 increases. Defendant, however, does not counterclaim for overpayment of wages.

The questions before this court are: (1) whether the Treasury implemented pay increases in accordance with § 5349(a) for fiscal years 1979 and 1980, and (2) whether the Treasury implemented pay increases in accordance with § 5349(a) for fiscal year 1983.

## DISCUSSION

Pursuant to RUSCC 56, both parties claim entitlement to judgment as a matter of law. Plaintiffs argue that on the basis of the record this court can determine that defendant's decision to withhold pay increases was arbitrary, capricious, and clearly wrong. Likewise, defendant asserts that Treasury's pay-fixing decisions were valid exercises of discretionary power under 5 U.S.C. § 5349(a).

The parties are in agreement regarding the operative facts in this case. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." RUSCC 56.

The United States Court of Appeals for the Federal Circuit stated:

> Where no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law, the court should utilize the salutary procedure of Fed.R.Civ.P. 56 to avoid unnecessary expense to the parties and wasteful utilization of the jury process and judicial resources.

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984).

### Standard of Review

■ Subsequent to briefing of the cross-motions for summary judgment in this case, the Federal Circuit issued its opinion in *Bradley v. United States,* 870 F.2d 1578 (Fed.Cir.1989). [3] The case at bar and *Bradley* both involve Bureau employees seeking pay adjustments pursuant to 5 U.S.C. § 5349(a). *Bradley* recognized Congress's broad grant of power to Treasury to fix and adjust the pay of Bureau employees. The Federal Circuit also reaffirmed that the judiciary is "not empowered to second-guess the executive's judgment on such a question." *Bradley,* 870 F.2d at 1581. Accordingly, the Claims Court may only de-

1. Mr. Ellenberger's June 29, 1988 Affidavit suggests that the 1983 pay raises may have violated the 1982 pay cap imposed by the Treasury. Defendant's Brief, filed Aug. 12, 1988, Appendix at 8; Exhibit R.

2. The Bureau's letter is dated "January 12, 1983." Yet in the opening sentence it refers to receipt of a letter from plaintiffs' counsel dated December 6, 1983. One of these two dates is incorrect. Most likely Mr. Ellenberger wrote the letter on January 12, 1984 rather than 1983. The letter also mentions that the second $17.20 per week raise was effective "May 2, 1983." Accordingly, for purposes of this case, this court refers to the Bureau's letter of January 12, 1984.

3. Title 5 U.S.C. 5349(a) is clearly a pay-mandating statute. *Bradley v. United States,* 870 F.2d 1578, 1580 (Fed.Cir.1989). Accordingly, this court has jurisdiction to hear claims arising under the statute. *Id.; Adams v. United States,* 810 F.2d 1142, 1143 (Fed.Cir.1987); *see Amell v. United States,* 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445 (1966).

cide whether the Government's decisions are arbitrary, capricious, or clearly wrong.

 For this court to set aside the determinations of a federal agency in a prevailing rate wage dispute, "plaintiff must show that there has been an abuse of discretion, or that such a determination is so arbitrary as to be clearly wrong." *Best v. United States*, 14 Cl.Ct. 720, 725 (1988). Plaintiffs bear a heavy burden of proof because of the broad Congressional grant of discretion under 5 U.S.C. § 5349(a). *Id.* Even though there is a "presumption of correctness accorded administrative decision-making...." *Bradley*, 870 F.2d at 1581, the Treasury's discretion to set employee wages is not unlimited under § 5349(a). The primary limitation on the executive's judgment in adjusting plaintiffs' wages "is that the discretion not be exercised so as to frustrate the congressional scheme." *National Maritime Union of Am. v. United States*, 231 Ct.Cl. 59, 74, 682 F.2d 944, 954 (1982), *Bradley*, 870 F.2d at 1581, *Blaha v. United States,* 206 Ct.Cl. 183, 194, 511 F.2d 1165, 1170 (1975).

### *1979—1980 Compliance with 5 U.S.C. § 5349(a)*

 Plaintiffs argue that Bureau employees should receive the wage increases paid at ABN in 1979 and 1980. Plaintiffs argue that the Bureau must fix pay rates without deviation from pay adjustments at ABN. In other words, according to plaintiffs, once the Bureau undertook to review Bureau wages for conformity with ABN wages, the Bureau had no discretion to deny the comparability increases.

This argument disregards the language of 5 U.S.C. § 5349(a). Section 5349(a) does not invariably require Bureau salaries to mirror ABN salaries. Rather, Bureau salaries should conform to comparable ABN salaries "as nearly as is consistent with the public interest." Therefore, with public interest at stake, the Secretary has discretion

to deny comparability increases. This public interest exception allows broad administrative flexibility and discretion in implementing pay increases. *Bradley*, 870 F.2d at 1581.

During fiscal years 1979 and 1980, the Administration decided, in the public interest, to limit pay increases. Thus, the public interest exception of § 5349(a) operated in those years to limit the statute's requirement of comparability with ABN pay rates.

In conformity with the pay caps in the public interest, the Bureau had discretion to limit wage increases to 5.5% in 1979 and 7.0% in 1980. Although the reason for the limited pay increases in fiscal years 1979 and 1980 was not announced to plaintiffs at the time this suit was filed, this oversight does not provide a basis for finding that those decisions were arbitrary, capricious, or clearly wrong. Compliance with the administration's anti-inflation program is exactly the type of public interest exception contemplated by § 5349(a). *Adams*, 810 F.2d at 1144.[4]

During 1979 and 1980, the Treasury issued two memoranda that effectively set plaintiffs' wages. In a Memorandum to the Director of Engraving and Printing, dated October 9, 1979, the Under Secretary of Treasury stated:

A lot of thought and discussion has been given to your request to [increase fiscal year 1979] wage rates to the full comparability level as an exception to the 5.5 percent wage increase limitation. From the discussions we have had on the matter, I fully understand the basis for your request and can appreciate the sensitivity that has resulted from the ceiling limitation.

As you know, the President took a very strong and unequivocal position in his January 4, 1979 memorandum for Heads of Executive Departments and Agencies, subject:

---

**4.** Plaintiffs participated in the *Adams* case as intervenors. *Adams* established that pay caps fit within the public interest exception of § 5349(a). 810 F.2d at 1144. The *Adams* court, however, did not review the specific circum-

stances of plaintiffs' 1983 wage increases as discussed later in this opinion. Plaintiffs' participation in *Adams* does not bar or impede their rights to pursue this action.

"Federal Pay and the Anti-inflation Program". Specifically he stated that . . . "I have determined that it would be *inconsistent with the public interest* for any category of Federal pay rates to be increased by more than 5.5 percent during fiscal year 1979." In consonance with that determination, he further stated that the policy of this Administration is:

> "In the public interest to control inflation, each officer . . . who has administrative authority to set rates of pay for any Federal . . . employees should exercise such authority, to the extent permissible under law . . . in such a way as to ensure that no rate of pay for any category of . . . employees is increased more than 5.5 percent during fiscal year 1979."

. . . .

To grant an exception to the 5.5 percent ceiling . . . would be taking action that clearly is counter to the Administration's policy. Under this condition, I do not feel that it is appropriate for me to recommend to the Secretary that your request be approved.

Deposition, Robert Ellenberger, filed Sept. 13, 1988, Exhibit I–5–1 (Dep.). A similar Memorandum to Bureau Heads from the Assistant Secretary (Administration), dated November 1, 1979, stated:

> The Administration and the Congress have taken action recently that again limits increases in Federal pay for most Federal workers. During fiscal year 1980, pay increases for the General Schedule and related pay systems, the members of the Uniformed Services, and most Federal wage employees will be controlled by a 7.02 percent ceiling.
>
> On October 3, the Director of the Office of Personnel Management sent a memorandum to Heads of Executive Departments and Agencies with guidance for complying with the policy of a 7.02 percent ceiling on pay increases for employees whose rates of pay are set by the administrative authority of the agency. . . .

> Consistent with the 7.02 percent ceiling policy, pay increases for employees in this Department whose pay rates are set under a Treasury approved system will be limited to no more than 7.02 percent during fiscal year 1980. . . .

Dep. at I–5–2.[5] These communications demonstrate that the "Treasury had the decisive role in determining [plaintiffs'] wages, and the undisputed fact is that Treasury deliberately decided to apply the overall [pay caps]. . . ." *Adams*, 810 F.2d at 1144 (footnote omitted).

The Secretary adjusted plaintiffs' wages to the highest rate possible without violating the pay caps for fiscal years 1979 and 1980. As such, the decision to limit plaintiffs' wages falls squarely within the public interest exception of § 5349(a). The decisions not to increase plaintiffs' pay above the ceilings set by the administration for pay increases were reasonable, rational decisions. These decisions furthered the public interest of limiting inflation and were part of a Government-wide effort to control automatic pay raises.

### 1983 Compliance with § 5349(a)

■ In 1983, the Treasury granted two $17.20 per week pay raises, but did not give plaintiffs the full amount of the raise received by comparable ABN employees. Treasury implemented this decision by treating the pay raise as a weekly increase and then pro-rating the amount on an hourly basis. Accordingly, while ABN employees received an increase of approximately $.50 per hour ($17.20 per week, 34.5 hour workweek), Bureau employees only received a $.43 per hour increase ($17.20 per week, 40 hour workweek).

Superficially, both ABN and Bureau employees appear to have received an equal pay raise. This appearance is not supported by the explicit language of § 5349(a). The statute commands that Bureau employees be paid "as nearly as is

---

5. Both memoranda quoted by this court are exhibits given to plaintiffs' counsel and filed with Mr. Ellenberger's deposition.

consistent with public interest" the "prevailing rates" at ABN. By use of the word "rates," § 5349(a) signals that Bureau employees should receive pay comparable to ABN employees for the same increment of work. Thus, each time ABN employees receive a $.50 per hour increase, Bureau employees should receive the same $.50 per hour increase unless the Treasury has made a specific finding that the public interest bars such an increase. Neither the Secretary nor his designate made a finding that it was in the public interest to hold plaintiffs' wages down at an hourly rate below employees at ABN.

The TPMM is even more specific. It provides that plaintiffs "will be paid rates based on a job-to-job comparison with jobs [at ABN]." TPMM, Chapter 532–33, ¶ 4. The manual also requires adjustment of plaintiffs' wages "whenever rates for each matched job are adjusted at [ABN]." *Id.* Under this rule, the Treasury must set plaintiffs' wages at the rate set for ABN employees. Further, Bureau employees' wages must be adjusted whenever ABN employees receive pay increases. Only a specific finding that the wage increase is barred by "the public interest" prevents Bureau employees from receiving wage adjustments equal to employees at ABN.

The fiscal 1983 pay increases were arbitrary and capricious and clearly erroneous. Treasury appropriately determined that plaintiffs performed the same additional work for which ABN employees received a $17.20 per week raise. Thus, Treasury gave plaintiffs the same $17.20 per week raise in conformity with § 5349(a). In doing so, Treasury, without any clear reason, failed to account for plaintiffs' longer workweek. Most important, the Bureau supplied no public interest rationale for paying plaintiffs $.07 per hour less than their ABN counterparts.

In the absence of a public interest justification for the distinction, the Bureau's action was arbitrary and capricious. Moreover, the Bureau was clearly wrong to deny the comparability required by § 5349(a) without reasons fitting within the statute. In sum, the Bureau made no statement why plaintiffs received $.43 per hour increases while ABN employees received $.50 per hour increases for the same additional work.

In order to perform its review function, this court must have a Treasury decision to review. In 1983, Treasury granted plaintiffs two $.43 per hour differential pay increases. Treasury clearly made a decision in 1983. Treasury, however, produced no evidence about how or why the decision was made. Nor does Treasury produce evidence of who made the decision. The absence of any apparent reasoned approval process also underscores the arbitrary and capricious nature of this 1983 decision.

A review of the documents filed in this case reveals that the Treasury cites no public interest reason to deny or grant the two $.50 per hour increases. In granting the $.43 per hour increases, Treasury cited no public interest reason—including applicable pay caps—for denying plaintiffs the full $.50 per hour increase. Treasury made no specific findings banning payment of the full $.50 per hour raises to plaintiffs.

In Mr. Ellenberger's January 12, 1984 letter, he states that Treasury considered the pay caps when granting the 1983 increases:

> The wage increase granted in Fiscal Year 1983 was limited by a 4% pay cap. This pay cap was imposed at the direction of the Department of the Treasury in accordance with guidance issued by the Office of Personnel Management (OPM).

> Two additional adjustments each of 17.20 per week, were granted to Bureau Engravers during FY 83. These increases were granted in accordance with the interchangeability provision of the labor management contract between the American Bank Note Company, New York and the New York Bank Note Engravers Guild. These adjustments were effective November 1, 1982 and May 2, 1983.

Thus, defendant knew of the pay caps when it granted the 1983 pay raises. The letter notes consideration of the $17.20 per week pay raises in light of the pay caps then in effect. Treasury granted the $.43

per hour raises without invoking a public interest reason to deny the increases. Apparently the Treasury thought the public interest in retaining highly skilled craft employees within public employ supported the raises. Treasury erroneously failed, however, to consider the duration of the workweek and grant the full $.50 per hour.

In 1988, Treasury made new statements in the context of this litigation regarding plaintiffs' 1983 raises. In a deposition on May 12, 1988, Robert Ellenberger, Chief, Office of Industrial Relations in the Bureau of Engraving, testified about "unauthorized" pay raises during 1983.[6] In the affidavit, sworn on June 29, 1988, Mr. Ellenberger stated that, in view of unexplained wage increases, "I have determined that the [1979] increase is presently precluded by [the] erroneous overpayments [in 1983]...." Defendant's Brief, filed Aug. 12, 1988 (Def. Br.), Appendix (App.) at 6. The erroneous overpayments referred to by Mr. Ellenberger are the two 1983 wage increases of $.43 per hour each.

The Treasury has broad discretion to adjust wages in the public interest. Mr. Ellenberger's 1988 rationale for the invalidity of the 1983 increases smacks of litigation strategy, rather than a determination in the public interest. The Federal Circuit has commented:

> It is clear that no deference is due to an agency "interpretation" fashioned for the purposes of litigation.

*Alaniz v. Office of Personnel Management*, 728 F.2d 1460, 1465 (1984). This court therefore discounts Mr. Ellenberger's conclusion that plaintiffs' 1983 raises were not valid. Moreover, Mr. Ellenberger still in 1988 does not provide a public interest reason for denying the full measure of the increases as required by § 5349(a).

Further, the 1988 "decision" by Mr. Ellenberger that the 1983 increases were "erroneous overpayments" was not made prior to its being submitted in the form of an affidavit to defendant's cross-motion for summary judgment. Clearly, any explana-tion at that late date regarding plaintiffs' wages was offered solely for the purpose of influencing the current litigation. The Ellenberger affidavit attempts to recharacterize Treasury's 1983 decisions. Moreover, the 1988 affidavit suggests that "the Bureau is preparing a recommendation to the Treasury to ratify the erroneous payments in the public interest...." Def.Br., App. at 7.

Treasury's explanation in 1988 does not consider fully the circumstances of 1983. Revisitation of the wage increases by defendant in 1988 is unlikely to reflect the public interest considerations of 1983.

This court's predecessor commented on the correct manner of invoking the public interest clause:

> [I]t appears that at first the government officials relied on other factors in reaching their decision, and then belatedly took the "retreat position" that the contested pay practices were not consistent with the public interest.... In the future ... we will expect express identification of the public interest clause at the outset as the source of authority for declining to follow a prevailing private sector pay practice. At that time and not later, after commencement of litigation, the government should set forth its reasons for the benefit of the union and subsequent judicial review.

*Daigle v. United States*, 217 Ct.Cl. 376, 386–87 (1978). The failure of the Treasury to state public interest reasons for denying the full raises in 1983 is exactly the abuse warned against by *Daigle*.

This court concludes that the decision to withhold the two additional $.07 per hour increases from plaintiffs' wages was arbitrary, capricious, and clearly wrong. This conclusion does not depend on when the Treasury ultimately decided to implement the two increases. If the decision was made in 1983, it was not documented or justified. If the decision was made in 1988, it was fashioned solely to influence this litigation and still did not state a public

---

**6.** In his affidavit, Mr. Ellenberger refers to a memorandum from the Bureau's legal counsel, William Colbert. Defendant has withheld from discovery Mr. Colbert's memorandum. Defendant claims a privilege precludes disclosure of this memo.

**611**

interest reason for denying the full measure of the ABN increase. Under either scenario, Treasury's failure to account for differing workweek durations between ABN and plaintiffs was fatally flawed and clearly wrong.

CONCLUSION

Treasury shows that the public interest barred increases in 1979 and 1980. By failing to grant plaintiffs the full measure of the 1983 raises, however, Treasury violated § 5349(a). Treasury's 1983 action was unreasonable, irrational, and clearly wrong. The pay increases granted during fiscal year 1983 should have been fully implemented. As such, this court finds plaintiffs are entitled to a $.14 per hour retroactive pay increase.

Accordingly, this court grants plaintiffs' motion for summary judgment and denies defendant's cross-motion. This court directs the parties to file a Joint Stipulation as to the amount of judgment within 30 days of the issuance of this opinion. After the filing of the Joint Stipulation, this court directs the Clerk to enter judgment for plaintiffs in the stipulated amount without further order of the court.

No costs.